UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 17-CV-61202-VALLE

CONSENT CASE

PATTY DIANE ARNOLD,

     Plaintiff,

v.

NANCY A. BERRYHILL,
Acting Commissioner of Social
Security Administration,

     Defendant.

_____/

## ORDER ON MOTIONS FOR SUMMARY JUDGMENT

THIS MATTER is before the undersigned on Plaintiff Patty Diane Arnold's Motion for Summary Judgment (ECF No. 16) and Defendant Nancy A. Berryhill, Acting Commissioner of the Social Security Administration's, Motion for Summary Judgment and Response (ECF Nos. 21 and 22) (the "Motions"). Pursuant to the parties' consent, this case is before the undersigned for all proceedings, including trial and entry of final judgment. (ECF Nos. 11 and 12); *see also* 28 U.S.C. § 636(c).

Accordingly, after due consideration of the record and the parties' briefs, including the Motions, Plaintiff's Reply (ECF No. 23), having heard oral argument, and being otherwise fully advised on the matter, Plaintiff's Motion is **DENIED**, Defendant's Motion is **GRANTED**, and the Administrative Law Judge's ("ALJ's") decision is **AFFIRMED** for the reasons set forth below.

# I.     PROCEDURAL HISTORY

This suit involves applications for disability insurance benefits ("DIB") and supplemental security income ("SSI") benefits under Titles II and XVI, respectively, of the Social Security Act, 42 U.S.C. § 401 *et seq*. (the "Act").  Plaintiff applied for benefits on December 20, 2013, and alleged a disability beginning on December 31, 2011.  (R. 42, 185, 191).[1]  Plaintiff's claim was denied initially and again upon reconsideration.  (R. 126, 130, 135, 141).  Plaintiff subsequently requested a hearing, which was held before ALJ Denise Pasvantis on November 4, 2015.  (R. 39-63, 147-49, 150-56, 157-78).  Plaintiff, appearing with counsel, and a Vocational Expert testified at the hearing.  (R. 39-63).

On January 13, 2016, the ALJ issued a decision (the "Decision") denying Plaintiff's application and finding that Plaintiff was not disabled within the meaning of the Act.  (R. 22-33).  Thereafter, the Appeals Council denied Plaintiff's request for review, rendering the ALJ's Decision the Commissioner's "final decision."  (R. 1-6, 14-18); *see Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir. 1986).  Plaintiff now seeks judicial review of the ALJ's Decision. (ECF No. 1); *see also* 42 U.S.C. § 405(g).  Both parties have moved for summary judgment, and the Motions are ripe for adjudication.  (ECF Nos. 16 and 21).

# II.     STANDARD OF REVIEW

Judicial review of the ALJ's Decision is limited to whether there is substantial evidence in the record as a whole to support the ALJ's finding and whether the ALJ applied the correct legal standards in making her determination.  *Carson v. Comm'r of Soc. Sec.*, 440 F. App'x 863, 864 (11th Cir. 2011) (internal citations omitted); *see also* 42 U.S.C. § 405(g).  "Substantial evidence is more than a scintilla and is such relevant evidence as a reasonable person would

---

[1] All references are to the record of the administrative proceeding, which was filed as part of the Defendant's Answer.  *See* (ECF No. 10).

accept as adequate to support a conclusion." *Carson*, 440 F. App'x at 864 (quoting *Crawford v. Comm'r of Soc. Sec.*, 363 F.3d 1155, 1158 (11th Cir. 2004)); *accord Hale v. Bowen*, 831 F.2d 1007, 1011 (11th Cir. 1987). A court, however, "may not decide the facts anew, reweigh the evidence, or substitute [its] judgment for that of the [ALJ]." *Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1178 (11th Cir. 2011) (internal citation omitted). Even if evidence preponderates against the ALJ's Decision, a court must affirm "if the decision is supported by substantial evidence." *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983) (citing 42 U.S.C. § 405(g)). Within this narrow role, however, courts do not act as automatons. *MacGregor v. Bowen*, 786 F.2d 1050, 1053 (11th Cir. 1986). Rather, they "must scrutinize the record as a whole to determine if the decision reached is reasonable and supported by substantial evidence." *Id.* (citing *Bloodsworth*, 703 F.2d at 1239).

To qualify for benefits, a claimant must be disabled within the meaning of the Act. *See* 42 U.S.C. § 423 (standard for disability insurance benefits) and § 1382 (standard for supplemental security income benefits). A claimant is disabled if she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). A "physical or mental impairment" is one that "results from anatomical, physiological or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. §§ 423(d)(3), 1382c(a)(3)(D).

To determine eligibility, the ALJ employs a five-step sequential evaluation:

(1)     Is the person presently unemployed?
(2)     Is the person's impairment severe?

| (3) | Does the person's impairment meet or equal one of the specific impairments set forth in 20 C.F.R. Part 404, Subpart. P, Appendix 1 (the "Listings")? |
| (4) | Is the person unable to perform his or her former occupation? |
| (5) | Is the person unable to perform any other work within the economy? |

20 C.F.R. §§ 404.1520(a)(4) (evaluation process for disability insurance benefits), 416.920(a)(4) (evaluation process for supplemental security income benefits). An affirmative answer to any of the above questions leads either to the next question or, on Steps 3 and 5, to a finding of disability. *McDaniel v. Bowen*, 800 F.2d 1026, 1030 (11th Cir. 1986). A negative answer to any question, other than Step 3, leads to a determination of "not disabled." *Id.*

Importantly, the burden of proof rests on the claimant through Step 4. *Phillips v. Barnhart*, 357 F.3d 1232, 1241 n.10 (11th Cir. 2004). At Step 4, the ALJ must consider: (i) the claimant's residual functional capacity ("RFC"); and (ii) the claimant's ability to return to her past relevant work. 20 C.F.R. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv). The regulations define RFC as that which an individual is still able to do despite the limitations caused by her impairments. 20 C.F.R. §§ 404.1545(a), 416.945(a). The ALJ will "assess and make a finding about [the claimant's RFC] on all the relevant medical and other evidence" in the case. 20 C.F.R. §§ 404.1520(e), 416.920(e). The RFC assessment is used to determine whether the claimant can return to her past relevant work under Step 4, and if so, "the ALJ will conclude that the claimant is not disabled." *Phillips*, 357 F.3d at 1238 (citations omitted). If a claimant cannot return to her past relevant work, then the ALJ proceeds to Step 5. *Id.*

At Step 5, the ALJ considers the claimant's RFC, age, education, and work experience to determine whether the claimant "can make an adjustment to other work." 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v); *Phillips*, 357 F.3d at 1239 (citation omitted). The ALJ must determine if there is other work available in significant numbers in the national economy

that the claimant has the ability to perform. *Phillips*, 357 F.3d at 1239. If the claimant can make the adjustment to other work, the ALJ will determine that the claimant is not disabled. *Id.* Conversely, if the claimant cannot make the adjustment to other work, the ALJ will determine that the claimant is disabled. *Id.* The ALJ may determine whether the claimant has the ability to adjust to other work in the national economy by either: (1) applying the Medical Vocational Guidelines (contained within 20 C.F.R. Part 404, Subpart P, Appendix 2); or (2) using a Vocational Expert, who can opine on whether someone with the claimant's limitations can obtain employment in the national economy. *Id.* at 1239-40.

## III. <u>THE RECORD</u>

### A. Plaintiff's Background and Hearing Testimony

Plaintiff was 49 years old on the alleged onset date and 53 years old on the date of the administrative hearing. (R. 42, 70, 84). In her application for benefits, Plaintiff alleged disability due to depression, anxiety, bipolar disorder, cholesterol, and thyroid problems. (R. 229). Plaintiff testified at the hearing that her bipolar disorder and anxiety are her main impediments to working. (R. 46). Plaintiff also stated that her brain is "very foggy" and that she has little energy. *Id.* Plaintiff takes several medications for her bipolar disorder, depression and anxiety. (R. 46-47). Plaintiff testified that the mediations help treat her conditions without side effects, but that Trazodone makes her sleepy. (R. 47-48, 54).

Plaintiff testified that she suffers from mood swings once or twice a week, which she attributes to stress. (R. 54). Plaintiff is depressed more often than she is manic. (R. 55). However, when Plaintiff is manic, she is unable to concentrate. *Id.* Plaintiff does not believe she could interact with co-workers or concentrate on a task during an eight-hour day. (R. 56). Plaintiff's short-term memory has been declining for the past year-and-a-half. (R. 57). Plaintiff

has been treated at Henderson Behavioral Health ("Henderson") for more than two years.  (R. 48, 53); *see also* (R. 306-16, 638-43, 653-71) (confirming Plaintiff was a patient since 2012). Plaintiff received therapy at Henderson, which she found helpful.[2]  (R. 48, 53).  Plaintiff did not testify about any physical impairments.  (R. 46)

Plaintiff lives in a house with a roommate.  (R. 45).  Regarding her daily activities, Plaintiff testified that she could bathe and dress herself and does so when she "feel[s] like it." (R. 49).  Plaintiff is able to cook but has no desire to do so.  *Id.*  Plaintiff can make a sandwich and use a microwave.  *Id.*  Plaintiff occasionally washes dishes.  *Id.*  Her roommate typically does the laundry.  *Id.*  Plaintiff does not mop, sweep, vacuum, or dust.  (R. 49-50).  Plaintiff goes grocery shopping "every once in a while" with her roommate but requires medication to do so. (R. 50-51); *but see* (R. 218) (indicating Plaintiff goes grocery shopping "once or twice a week").

Regarding her social activities, Plaintiff testified that she does not visit with family or friends, go to church or temple, or have any hobbies.  (R. 50).  Plaintiff goes out to eat or to the movies "very rarely."  (R. 51).  Plaintiff has not traveled since 2011.  (R. 50).  Plaintiff reads, watches television, and talks on the telephone.  (R. 50-51).  Plaintiff does not want to leave her home because being around people causes her fear and anxiety.  (R. 52).  However, Plaintiff leaves her home to go grocery shopping or attend medical appointments.  (R. 51).

Plaintiff completed 12th grade and previously worked as a realtor and sales associate. (R. 42, 206-13, 230).  More specifically, from 1989 to 2004, Plaintiff worked full-time as a real estate broker.  (R. 230).  From 2008 to 2011, Plaintiff worked part-time in sales.  *Id.*  Plaintiff worked briefly as a telemarketer in 2012 and 2013.  (R. 43-44).  In 2012 and 2013, Plaintiff

---

[2] The record does not contain any records for Plaintiff's therapy sessions.  (ECF No. 16 at 7, n.14).

stopped working after just a few weeks because of her fear of leaving home. (R. 44). Plaintiff has not attempted to work since 2013. *Id.*

### B. Vocational Expert's Testimony

A Vocational Expert also testified at the hearing. (R. 59-62). The ALJ asked the Vocational Expert whether a hypothetical individual of Plaintiff's age, education, and work experience, with no exertional limitations, but who was limited to concentrating for two-hour segments and to occasional interactions with others could perform Plaintiff's past relevant work. (R. 61). The Vocational Expert advised that the hypothetical individual could not perform Plaintiff's past relevant work. *Id.* The hypothetical individual could, however, perform other work in the national economy. *Id.* Specifically, Plaintiff could perform two unskilled jobs at the medium exertion level (hand packager and machine packager) and two unskilled jobs at the light exertion level (hotel housekeeper or a shellfish preparer). (R. 62).

## IV. THE ALJ'S DECISION

On January 13, 2016, after reviewing the evidence and conducting the requisite five-step analysis, the ALJ concluded that Plaintiff was not disabled under the Act. (R. 23, 33).

At Step 1, the ALJ determined that Plaintiff has not engaged in substantial gainful activity since December 31, 2011, the alleged onset date. (R. 24).

At Step 2, the ALJ found that Plaintiff's bipolar disorder, anxiety, alcohol dependence, and marijuana abuse were severe impairments. (R. 25).

At Step 3, the ALJ concluded that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the Listings. (R. 25-27).

At Step 4, the ALJ determined that Plaintiff has the RFC to perform a full range of work at all exertional levels but could only concentrate and persist for two-hour segments and was limited to occasional interaction with others. (R. 27-31).

At Step 5, based on the testimony of the Vocational Expert and considering Plaintiff's age, education, work experience, and RFC, the ALJ concluded that Plaintiff could not perform her past relevant work but could perform two medium and two light exertional, unskilled jobs in the national economy. (R. 31-32).

## V. DISCUSSION

Plaintiff raises three arguments on appeal. First, Plaintiff argues that the ALJ failed to properly consider evidence after Plaintiff's date last insured (September 30, 2013), which was relevant to Plaintiff's SSI claim. (ECF No. 16 at 13-14). Second, Plaintiff argues that the ALJ erred in assigning "little weight" to the opinions of Plaintiff's treating psychiatrist (Dr. Helia Ibarra) and nurse practitioner (JoAnne Willis), and by adopting a mental and physical residual functional capacity that was unsupported by the evidence. *Id.* at 14-18. Lastly, Plaintiff argues that the ALJ erred in assessing Plaintiff's credibility. *Id.* at 18-20. For the reasons set forth below, the undersigned finds that the ALJ applied the correct legal standards and that substantial evidence supports the ALJ's Decision.

### A. The ALJ Properly Considered Plaintiff's SSI Claim

Plaintiff argues that the ALJ erroneously concluded that Plaintiff's case was only a Title II DIB claim and, therefore, failed to consider evidence dated after September 30, 2013, which was relevant to Plaintiff's Title XVI SSI claim. *Id.* at 18-19. To support this argument, Plaintiff relies on two statements in the ALJ's Decision. *Id.* First, Plaintiff points to the following passage in the ALJ's Decision:

> The undersigned notes that this is [a] *Title II case only* with an alleged onset date of December 31, 2011 and expiration of date last insured on September 30, 2013. A review of the medical evidence of record does not establish any severe physical impairments before the expiration of the date last insured. Furthermore, the medical evidence after the expiration of the date last insured indicates an improvement in the claimant's mental impairments with medications.

*Id.* at 14; *see also* (R. 28) (emphasis added).

Next, Plaintiff points to the ALJ's discussion of Dr. P.S. Krishnamurthy's opinion. The ALJ stated that Dr. Krishnamurthy's opinion was "not supported by medically acceptable clinical findings and laboratory diagnostic techniques *prior to the expiration of the date last insured*." (ECF No. 16 at 14); *see also* (R. 31) (emphasis added).

Although the Government concedes that the ALJ's statement that this case is a "Title II case only" was a scrivener's error, it argues that other statements in the ALJ's discussion of the evidence demonstrates that the ALJ properly considered Plaintiff's SSI claim. (ECF No. 21 at 6). Further, the Government asserts that the ALJ's statement regarding Dr. Krishnamurthy's opinion was taken out of context because the portion of Dr. Krishnamurthy's opinion cited by the ALJ came from Dr. Krishnamurthy's reconsideration of Plaintiff's DIB claim. *Id.* at 4-6; *see also* (Ex. 5A).

Courts within the Eleventh Circuit have recognized "two types of typographical errors in Social Security cases." *See Burch v. Berryhill*, 16-CV-3524, 2018 WL 683718, at *9 (M.D. Fla. Jan. 16, 2018) (citing *Sawyers v. Colvin*, 12-CV-3610, 2014 WL 588019, at *8 (N.D. Ala. Feb. 14, 2014), *report and recommendation adopted*, 16-CV-3524, 2018 WL 647469 (M.D. Fla. Jan 31, 2018). As explained in *Sawyers*:

> The first are cases in which a typographical error is clear on its face. *See Womack v. Colvin*, No. 8:12–cv–1316–T–TGW, 2013 WL 3878734, at *1 n.3 (M.D. Fla. July 25, 2013) (noting that "[t]he law judge wrote in her decision 'lemon grader'

instead of 'linen grader,' ... [which was] obviously a typographical error"). The second are cases in which the typographical error is abundantly clear in light of the contents of the record. *See Roberson v. Astrue*, No. 3:11–cv–02824–AKK, 2012 WL 3628678, at *4 (N.D. Ala. Aug. 17, 2012) (finding that a single reference to the claimant's ability to perform light work was a typographical error because the record clearly indicated that the ALJ intended the claimant to perform sedentary work with exceptions); *Reed v. Astrue*, No. 09–0149–KD–N, 2009 WL 3571699 at *1 n.1 (S.D. Ala. Oct. 26, 2009) (finding that because "records indicate that the [claimant's] initials are DJMR and that he uses his first name[,][t]he Commissioner's reference to claimant as 'JMR' in the brief appears to be a typographical error"); *Moore v. Astrue*, No. 0:06–3514–HFFBM, 2008 WL 216605, at *4–5 (D.S.C. Jan. 24, 2008) (stating that a claimant's depression was a "severe impairment" in the facts section of the decision was clearly a scrivener's error because the ALJ analyzed it as a non-severe impairment "at length" in the remainder of the opinion) . . . .

*Sawyers*, 2014 WL 588019, at *8.

Here, the undersigned finds that the ALJ's statement that this is a "Title II case only" is a typographical error of the second type outlined in *Sawyers*. The ALJ's Decision makes clear that the ALJ considered evidence regarding Plaintiff's SSI claim. For example, the ALJ states in the first paragraph of the Decision that "[t]he claimant also filed a Title XVI application for supplemental security income on December 20, 2013" and ultimately concludes that Plaintiff "is not disabled under section 1614(a)(3)(A) of the Social Security Act." (R. 22, 33). Moreover, the ALJ discussed more than 20 instances of medical treatment that occurred after Plaintiff's date last insured of September 30, 2013.[3] (R. 29-31). The ALJ's statements acknowledging the SSI claim and the ALJ's analysis of the evidence after Plaintiff's date last insured make clear that the

---

[3] Plaintiff argues that although the ALJ summarized evidence dated after Plaintiff's date last insured, the ALJ nonetheless failed to consider "critical evidence" regarding Plaintiff's brain atrophy, impaired memory, epilepsy, and left hip. (ECF No. 23 at 2). However, the ALJ cites Exhibit 14F at 27 of the record (R. 30), which notes Plaintiff's "[g]eneralized idiopathic epilepsy" and categorizes the condition as "intractable." (R. 741). Exhibit 14F also notes Plaintiff's progressively worsening dementia and "significant bifrontal atrophy on CT [b]rain, [and] central atrophy w[ith] significant enlargement of the ventricular system." *Id.* Lastly, Exhibit 14F includes the X-Ray of Plaintiff's left hip, the MRI of Plaintiff's brain, and two CT scans of Plaintiff's brain. (R. 743-46). Accordingly, Plaintiff's claim that the ALJ failed to consider this evidence is refuted by the Decision.

ALJ's statement that this is a "Title II case only" was simply a typographical error. Accordingly, the undersigned finds that the ALJ properly considered evidence regarding Plaintiff's SSI claim.

Additionally, this Court agrees with Defendant that the ALJ's statement regarding Dr. Krishnamurthy's opinion was taken out of context. When discussing Dr. Krishnamurthy's opinion, the ALJ cited to Exhibit 5A, which is Dr. Krishnamurthy's opinion of the DIB claim at the reconsideration level.[4] (R. 31, 84-96). When reconsidering Plaintiff's DIB claim, Dr. Krishnamurthy's opinion had to be based on the medical evidence before the date last insured. *See Moore v. Barnhart*, 405 F.3d 1208, 1211 (11th Cir. 2005) (citing 42 U.S.C. § 423(a)(1)(A)) ("For DIB claims, a claimant is eligible for benefits where she demonstrates disability on or before the last date for which she were [sic] insured."). Thus, when read in context, the ALJ's statement regarding Dr. Krishnamurthy's opinion on the DIB claim indicates no error in evaluating the SSI claim.

**B.      The ALJ Properly Weighed the Medical Opinions**

Plaintiff next argues that the ALJ erred in according "little weight" to the opinions of Plaintiff's treating mental health sources (Dr. Helia Ibarra and ARNP Joanne Willis) and a State Agency reviewer's (Dr. Krishnamurthy) physical RFC opinion, while giving "great weight" to the opinions of two State Agency reviewers (Drs. Keith Bauer and Dana Deboskey), and to Dr. Dennis Liston's single-examination GAF score. (ECF No. 16 at 14-18). For the reasons

---

[4] Dr. Krishnamurthy also opined on Plaintiff's SSI claim upon reconsideration at Exhibit 6A. (R. 97-109). Although the ALJ did not cite to Exhibit 6A in her Decision, the ALJ nonetheless considered the medical evidence before and after the date last insured, which did not support a light physical RFC finding. *See infra* Section V.B.2.b. and V.C. Furthermore, even if the ALJ erred in evaluating Dr. Krishnamurthy's opinion, the Vocational Expert found that the Plaintiff could perform two light exertion jobs. (R. 32-33). Thus, any error in evaluating Dr. Krishnamurthy's opinion was, at worst, harmless error. *See Molina v. Astrue,* 674 F.3d 1104, 1115 (9th Cir. 2012) ("[A]n ALJ's error is harmless where it is 'inconsequential to the ultimate nondisability determination.'") (citations omitted).

discussed below, the undersigned finds that the ALJ applied the proper legal standards in weighing the medical opinion evidence, and that her Decision is supported by substantial evidence.

### 1. The ALJ Properly Weighed the Opinions of Dr. Ibarra and ARNP Willis

Plaintiff received mental health counseling and medications at Henderson from September 5, 2012 through October 16, 2015. (R. 48, 53); *see also* (R. 306-19, 638-643, 653-75). During this time, Plaintiff was treated by psychiatrist Dr. Ibarra and ARNPs James Foster, Donna Bos, and Joanne Willis. *Id.* According to the treatment records, Dr. Ibarra saw Plaintiff at least six times between September 2012 and December 2013 (R. 306, 309-12, 314-16); ARNP Foster saw Plaintiff once in September 2013 (R. 313); ARNP Bos saw Plaintiff twice, in January and March 2014 (R. 668-71); and ARNP Willis saw Plaintiff ten times between May 2014 and October 2015. (R. 638-43, 653-67).

#### a. Dr. Ibarra

Dr. Ibarra first saw Plaintiff on September 5, 2012. (R. 306). Progress notes from that day reflect Plaintiff's account of depression, mood swings, insomnia, and anxiety, as well as Plaintiff's personal and medical history. (R. 306-08). At Plaintiff's second visit in January 2013, Dr. Ibarra assigned Plaintiff a GAF score of 44, which remained unchanged through her visits. (R. 309-12, 314-16). Dr. Ibarra's progress notes are brief and contain little substantive information. *See* (R. 306-12, 314-16). Indeed, other than briefly recounting Plaintiff's complaints, Dr. Ibarra's notes generally reflect only that Plaintiff was not suicidal or homicidal, with no discussion of Plaintiff's mental status, such as speech, thought process, memory, social functioning, attention, concentration, or appearance. *Id.*

On December 19, 2013, Dr. Ibarra completed a Mental Capacities Evaluation form

("MCE"), in which she opined that Plaintiff had severe limitations in mental functioning.[5] (R. 344-56). The ALJ assigned Dr. Ibarra's MCE opinion "little weight." (R. 31). Plaintiff argues that the ALJ erred in assigning "little weight" to Dr. Ibarra's opinion. (ECF No. 16 at 14-17). According to Plaintiff, Dr. Ibarra consistently "documented [Plaintiff's] symptoms of depression, anxiety, and mood swings," which necessitated frequent adjustments to Plaintiff's medication and culminated in a brief period of hospitalization. *Id.* at 16. Plaintiff also argues that Plaintiff's mental status examinations were not within normal range, thereby justifying Dr. Ibarra's (and ARNP Willis') opinion that Plaintiff had severe mental functional limitations. *Id.* at 16-17.

Generally, the opinion of a treating source,[6] like Dr. Ibarra, "must be given substantial or considerable weight unless 'good cause' is shown to the contrary." *Phillips*, 357 F.3d at 1240 (quoting *Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir.1997)); *see also* 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). The Eleventh Circuit has held that "'good cause' exists when the: (1) treating physician's opinion was not bolstered by the evidence; (2) evidence supported a contrary finding; or (3) treating physician's opinion was conclusory or inconsistent with the doctor's own medical records." *Id.* An ALJ can discount the opinion of any doctor, including a

---

[5] More specifically, Dr. Ibarra noted that Plaintiff had "marked" difficulty in maintaining social functioning. (R. 353); *see also* (R. 344) (indicating Plaintiff had "fair" difficulty in maintaining social functioning). Plaintiff had "poor" ability to: (i) sustain concentration and attention (R. 345-46); (ii) make simple, work-related decisions (R. 347); and (iii) perform work requiring regular contact with others, relate to supervisors and co-workers, and respond appropriately to supervision (R. 346-47). Plaintiff also had "poor" ability to complete a normal workday and work week without interruptions from psychologically based symptoms and perform at a consistent pace. (R. 348). Dr. Ibarra opined that Plaintiff would miss four or more days of work per month due to symptomatic episodes. *Id.*

[6] A "treating source" is the claimant's own physician or psychologist who has provided the claimant with medical treatment or evaluation, and who has had "an ongoing treatment relationship" with the claimant. 20 C.F.R. §§ 404.1527(a)(2), 416.927(a)(2). An "ongoing treatment relationship" generally means the claimant sees, or has seen, the physician or psychologist "with a frequency consistent with accepted medical practice for the type of treatment and/or evaluation required for [the claimant's] medical condition(s)." *Id.*

treating source, as long as she articulates good reason for doing so. *Phillips*, 357 F.3d at 1241; 20 C.F.R. §§ 404.1527(c), 416.927(c); *Crawford*, 363 F.3d at 1159-60.

In assigning "little weight" to Dr. Ibarra's opinion, the ALJ stated:

[T]he undersigned is according little weight to [Dr.] Ibarra's opinion because it is not supported by clinical findings or the substantial medical evidence of record. Furthermore, the claimant's mental status examinations have consistently been within normal limitations and do not support such severe mental functional limitations (Exs. 1F and 9F).

(R. 31).

The undersigned finds the ALJ sufficiently articulated "good cause" to accord "little weight" to Dr. Ibarra's opinion. As the ALJ concluded, Dr. Ibarra's opinion is not supported by clinical findings or her own treatment notes, and is inconsistent with the substantial evidence in the record. For example, although in the MCE Dr. Ibarra rates Plaintiff's limitations in concentration and attention as "poor" and "marked,"[7] Dr. Ibarra's treatment notes do not support this finding. *Compare* (R. 345-46, 354) (MCE opining that Plaintiff has severe impairments in concentration and attention), *with* (R. 306, 309-12, 314-16) (treatment notes containing no reference to Plaintiff's concentration or attention). Dr. Ibarra's MCE is also inconsistent with the mental status examinations conducted by other providers at Henderson who found Plaintiff's attention and concentration was, at worst, "fair." For example, ARNP Foster and ARNP Bos found Plaintiff's attention and concentration was "fair" and "good," respectively, and ARNP

---

[7] The MCE defines ability to function as "fair" if it is "seriously limited and less than satisfactory, but not precluded in all circumstances." (R. 344). An ability to function is "poor" if it "precludes a patient from satisfactorily performing [an] activity independently, appropriately, effectively, and on a sustained basis in a regular work setting." *Id.* A "marked" limitation is "an extreme level of impairment or limitation of ability to function." *Id.* The second section of the MCE does not define the various degrees of impairment, but ranks them on a scale of increasing severity of none/mild, moderate, marked, and extreme. (R. 351-56).

Willis found Plaintiff's attention and concentration was "fair" at all ten of Plaintiff's visits.  *See* (R. 638-43, 653-67).

Dr. Ibarra's opinion that Plaintiff had "poor" ability to make simple, work-related decisions is also unsupported by the record.  (R. 347).  Dr. Ibarra's own treatment notes do not reflect any deficit in Plaintiff's thought process or judgment.  *See* (R. 306, 309-12, 314-16).  In contrast, other record evidence shows that Plaintiff's insight and judgment were not as limited as Dr. Ibarra opined.  For example, Dr. Liston found Plaintiff was "[c]ognitively, [] grossly intact," with sequential thought process, and fair insight and judgment.[8] (R. 371-72).  ARNP Foster also found Plaintiff had intact associations and logical thought process.  (R. 313).  ARNP Bos found Plaintiff had intact associations, good insight and judgment, and logical thought process.  (R. 668-71).  Similarly, ARNP Willis found Plaintiff had fair judgment and insight throughout all ten treatment sessions.  (R. 638-43, 653-67).

Regarding Plaintiff's social functioning, Dr. Ibarra's treatment notes do not support her conclusions that Plaintiff had "fair" and "marked" difficulties in this area, "poor" ability to perform work requiring regular contact with others, and "poor" ability to relate to supervisors and co-workers.  *Compare, e.g.,* (R. 344, 353) (MCE opining that Plaintiff had "poor" and "marked" difficulty in maintaining social functioning), *with* (R. 306, 309-12, 314-16) (treatment notes containing no mention of Plaintiff's social functioning), *and* (R. 346-47) (MCE opining Plaintiff's ability to interact with co-workers and supervisors was "poor"), *with* (R. 353) (MCE indicating Dr. Ibarra's lack of knowledge of whether Plaintiff had a history of altercations or fear

---

[8] Plaintiff also argues that Dr. Liston's GAF score is an outlier and should not have been accorded "great weight."  (ECF No. 16 at 17).  However, the undersigned finds no error because Dr. Liston's GAF score is consistent with his mental status examination of Plaintiff and the treatment notes of the other providers in the record.  *See* (R. 309-13, 314-16, 371-72, 638-43, 653-67, 668-71) (other providers' treatment notes reflecting mostly normal mental status examinations).

of others). Nor do Plaintiff's own statements support Dr. Ibarra's opinion on Plaintiff's social functioning. For example, on December 31, 2013—just 11 days after Dr. Ibarra's MCE— Plaintiff completed a function report indicating that she gets along with authority figures "very well" and has never been fired from a job because of problems interacting with others. (R. 221). Further, Plaintiff testified at the administrative hearing that she lives with a roommate and gets along with her neighbors. (R. 45, 55).

Lastly, Dr. Ibarra's opinion regarding the frequency of Plaintiff's episodes of decompensation (and Plaintiff's four anticipated work absences) is also unsupported by the medical record. *See* (R. 345, 348, 354-56). In fact, the record shows only one brief hospitalization, which occurred almost six months *after* Plaintiff's last appointment with Dr. Ibarra. *See* (R. 446-85).

Against this backdrop, the undersigned finds the ALJ had good cause to discount Dr. Ibarra's MCE opinion as unsupported by her own treatment notes and inconsistent with the record as a whole. *See* (R. 28-30); *see also Womble v. Comm'r of Soc. Sec.*, 705 F. App'x 923, 927 (11th Cir. 2017) (upholding ALJ's decision to accord little weight to treating physician's opinion where it was inconsistent with treatment notes and other record evidence); *Moore v. Soc. Sec. Admin.,* 649 F. App'x 941, 943 (11th Cir. 2016); *Crawford*, 363 F.3d at 1160.

### b. ARNP Willis' Opinion

Between May 2014 and October 2015, Plaintiff saw ARNP Willis ten times.[9]

---

[9] In January and March 2014, Plaintiff was examined by ARNP Bos, who found that Plaintiff's bipolar disorder was stable or improved and Plaintiff's mental state was good. (R. 668-71). More specifically, Plaintiff's speech was coherent, thought process was logical, associations were intact, judgment and insight were good, orientation was intact, recent and remote memory was good, attention and concentration was good, fund of knowledge was good. *Id.* Plaintiff's mood and affect was calm and euthymic on the first visit, but anxious on the second. *Id.*

(R. 638-43, 653-67). At the May 2014 visit, Plaintiff stated that Zoloft was no longer effective for her depression and she felt anxious. (R. 666-67). Plaintiff reported being sober for one year. *Id.* At this visit, ARNP Willis noted that Plaintiff's bipolar disorder was worsening and modified Plaintiff's medication regimen. *Id.* Plaintiff's mental status examination showed rapid speech, logical thought process, circumstantial associations, fair judgment and insight, intact orientation, fair recent or remote memory, fair attention and concentration, good language, fair fund of knowledge, and anxious mood. *Id.* ARNP Willis assigned Plaintiff a GAF score of 44. *Id.*

At the June 2014 visit, Plaintiff reported that she was hospitalized after taking Cymbalta for "hearing voices" and relapsing on alcohol.[10] (R. 664-65). ARNP Willis adjusted Plaintiff's medications and reintroduced Zoloft. *Id.* Plaintiff's GAF score was again listed as 44. *Id.* At this visit, Plaintiff exhibited coherent speech, logical thought process, circumstantial associations, fair judgment and insight, intact orientation, fair memory, fair attention and concentration, good language, fair fund of knowledge, and a calm mood. *Id.*

Plaintiff's last eight visits with ARNP Willis were largely unremarkable. ARNP Willis' notes reflect that Plaintiff had coherent speech, logical thought process, fair judgment and insight, intact orientation, fair memory, fair attention and concentration, a fair fund of knowledge, and a calm mood. (R. 638-43, 653-63). At times, Plaintiff's associations varied from circumstantial to intact, and her language ranged from fair to good. *Id.* Plaintiff's GAF score of 44 remained throughout all visits. *Id.* In five of these eight visits, ARNP Willis

---

[10] At the hospital, Plaintiff admitted to relapsing on alcohol, drinking five beers, and taking Xanax. (R. 450, 455, 484). Plaintiff also reported that "[s]he had taken 200 mg of trazodone and a glass of wine" to try to relieve her symptoms before coming to the hospital. (R. 464, 484). Plaintiff's medical reports indicate daily alcohol intake as well as use of marijuana. (R. 447, 464, 455). During Plaintiff's hospitalization, Plaintiff participated in a behavioral health group with a social worker on four occasions. (R. 475-77). The social worker noted Plaintiff's calm mood, congruent affect, logical thought process, and intact thought content. *Id.* Plaintiff's condition was "improved" upon discharge. (R. 463).

described Plaintiff's bipolar disorder as "stable or improved." (R. 640-41, 654-57, 660-63). On the three visits at which Plaintiff's bipolar disorder was described as "worsening," ARNP Willis noted that: (i) Plaintiff was "non-compliant with medications" (January 21, 2015) (R. 658-59); (ii) Plaintiff's condition "worsens around the time of menses" (June 24, 2015) (R. 642-43); and (iii) a "CT scan of [Plaintiff's] brain shows volume loss, awaiting neurology consult." (October 16, 2015) (R. 638-39).

On October 20, 2015, ARNP Willis completed an MCE for Plaintiff, in which she opined that Plaintiff had severe limitations in mental functioning.[11] (R. 690-704). The ALJ assigned ARNP Willis' MCE opinion "little weight." (R. 31). In doing so, the ALJ stated:

> [T]he undersigned is according little weight to Ms. Willis' opinion because it is not supported by clinical findings or the substantial medical evidence of record including her own treatment notes documenting that the claimant's bipolar disorder was improved or stable with medications. (Ex. 9F). Furthermore, the claimant's mental health status examinations have consistently been within normal limitations and do no[t] support such severe mental functional limitations. (Exs. 1F and 9F).

*Id.*

Plaintiff argues that the ALJ erred in assigning "little weight" to this opinion. (ECF No. 16 at 14-17). According to Plaintiff, ARNP Willis' opinion should be given greater weight and is supported by Plaintiff's "intermittent worsening of bipolar symptoms" and increased "symptoms of brain atrophy." (ECF No. 16 at 16).

After reviewing the record, the undersigned concludes that the ALJ properly evaluated ARNP Willis' opinion. While the ALJ was required to, and in fact did, consider the opinion of

---

[11] Specifically, ARNP Willis opined that Plaintiff had "marked" limitations in her ability to: (i) concentrate and focus (R. 691-93); (ii) use her judgment (R. 692); (iii) carry out and remember simple instructions (R. 691); and (iv) relate appropriately to supervisors and co-workers (R. 692). Plaintiff also had a "marked" degree of repeated episodes of deterioration or decompensation (R. 691), and would miss 30 days of work per month (R. 693). In addition, Plaintiff showed "poor information retention, poverty of thought/speech, [and] poor cognition" (R. 693).

ARNP Willis, at the time of the ALJ's Decision, ARNPs were not considered acceptable medical sources whose opinions would be entitled to controlling weight.[12]  *Farnsworth v. Soc. Sec. Admin.*, 636 F. App'x 776, 783-84 (11th Cir. 2016) (citing 20 C.F.R. §§ 404.1513(d)(1), 404.1527(c), 416.913(d)(1), 416.927(c); SSR 06–03p, 2006 WL 2329939, at *2, *6) (explaining that "only 'acceptable medical sources' can be considered treating sources . . . whose medical opinions may be entitled to controlling weight").  Accordingly, the ALJ weighed ARNP Willis' opinion as she would any other medical opinion.  *See* 20 C.F.R. §§ 404.1527, 416.927 (listing the factors an ALJ will consider when evaluating an opinion).

Like Dr. Ibarra's opinion, ARNP Willis' opinion is conclusory and inconsistent with her own treatment notes and other evidence in the record.  For example, although ARNP Willis opined that Plaintiff's ability to concentrate and focus was "markedly"[13] impaired, her treatment notes for all ten visits—whether Plaintiff's condition was noted to be stable or worsening—indicate that Plaintiff's attention and concentration was "fair."  *Compare* (R. 691-93) (MCE opining that Plaintiff has severe impairments in concentration and attention), *with* (R. 638-43, 653-67) (treatment notes consistently indicating Plaintiff's concentration and attention was fair).  Similarly, although ARNP Willis opined that Plaintiff had "marked" difficulty in judgment, her treatment notes for all ten visits indicate that Plaintiff had "fair" judgment and insight.  *Compare* (R. 692) (MCE opining that Plaintiff had severely impaired judgment), *with* (R. 638-43, 653-67) (treatment notes consistently indicating Plaintiff's insight and judgment were "fair"); *see also* (R. 730) (neurology records reflecting good insight and

---

[12] A nurse practitioner is not considered an acceptable medical source for claims filed prior to March 27, 2017.  *See* 20 §§ C.F.R. 404.1502(7), 416.902(7).

[13] The MCE defines "marked" as "an extreme level of impairment or limitation of ability to function that would preclude the patient from functioning at least 50% of an 8-hour workday." (R. 690).

judgment). Further, although ARNP Willis opined Plaintiff had "marked" difficulty in carrying out and remembering simple instructions and had "poor information retention, poverty of thought, [and] poor cognition," her treatment notes repeatedly indicate that Plaintiff had fair memory and logical thought. *Compare* (R. 691, 693) (MCE opining that Plaintiff had severe impairments in memory and thought process), *with* (R. 638-43, 653-67) (treatment notes consistently indicating Plaintiff had fair memory and thought process); *see also* (R. 475-77) (hospital records noting Plaintiff's logical thought process and intact thought content).

Similarly, ARNP Willis' opinion that Plaintiff had "poor" ability to maintain social functioning is not supported by the record. For example, although Plaintiff asserted that she is fearful of leaving her home and experiences anxiety when interacting with others, *see* (R. 44, 46, 52, 638), the ALJ noted that Plaintiff lives and with a roommate, and is able to go to the grocery store when she takes her medication. (R. 26, 45, 50-51). Plaintiff also indicated in the function report that she goes grocery shopping once or twice a week, gets along "very well" with authority figures, and has never been fired from a job because of difficulty getting along with others. (R. 218, 221).

ARNP Willis' opinion that Plaintiff had "marked" repeated episodes of deterioration or decompensation is also contradicted by the record. (R. 691). Although Plaintiff's condition fluctuated, Plaintiff was generally stable when she was compliant with her medications. *See* (R. 309-13, 315, 371-72, 523, 640-41, 654-57, 660-63, 668-71). Moreover, the record contains only one instance (in May 2014) where Plaintiff was briefly hospitalized because of Plaintiff's use of drugs and alcohol and a change in medications. *See* (R. 455) (noting drug and alcohol use were the causes of Plaintiff's hospitalization); *see also* (R. 446-85). Thus, ARNP Willis' opinion that Plaintiff would miss 30 days of work per month is unsupported by the record. *See* (R. 693).

Lastly, during oral argument before the undersigned and numerous times throughout Plaintiff's briefs, Plaintiff argues that the ALJ erred in not considering a CT scan of Plaintiff's brain, showing volume loss. (ECF Nos. 16 at 16 and 23 at 2, 4-5); *see, e.g.* Hr'g Tr. 10:10-22. This argument is unpersuasive. Plaintiff testified at the administrative hearing that she underwent a brain scan, that she was "foggy," and that she suffered short-term memory loss. (R. 57). Nevertheless, while the neurologist noted some short-term memory loss, the doctor concluded that Plaintiff's remote memory was a "4/4" and that Plaintiff's understanding, insight, and judgment were "good" despite Plaintiff's volume loss. (R. 730). The ALJ specifically referred to the neurology records in her Decision. (R. 30) (citing to Exh. 14F); *see also supra* note 3, at 10. Moreover, the record does not contain any opinion evidence indicating the effect, if any, of Plaintiff's volume loss on her ability to work. *Moore*, 405 F.3d at 1213, n.6. (finding that the mere existence of an impairment does not reveal the extent to which it limits a claimant's ability to work or "undermine the ALJ's determination in that regard."). Accordingly, the undersigned finds the ALJ did not err in evaluating ARNP Willis' opinion.

### 2. The ALJ Properly Weighed the Opinions of State Agency Reviewers Drs. Bauer, Deboskey, and Krishnamurthy

The record contains opinions from State Agency reviewers Drs. Keith Bauer, Dana Deboskey, and P.S. Krishnamurthy. More specifically, in January 2014, Keith Bauer, Ph.D., reviewed the medical evidence regarding Plaintiff's mental and physical conditions at the initial level for both her SSI and DIB claims. (R. 70-81, 112-23). Dr. Bauer found Plaintiff's anxiety and bipolar disorder were severe impairments that resulted in no more than moderate limitations. *Id.* Specifically, Dr. Bauer concluded Plaintiff had a mild restriction in activities of daily living; moderate difficulties in maintaining social functioning; moderate difficulties in maintaining concentration persistence, or pace; and no repeated episodes of decompensation of extended

duration.  (R. 74, 116).

In February 2014, Dana Deboskey, Ph.D., reviewed the medical evidence regarding Plaintiff's mental impairments at the reconsideration level for both her SSI and DIB claims. (R. 84-96, 97-109).  Dr. Deboskey found Plaintiff's anxiety and bipolar disorder were severe impairments that resulted in no more than moderate limitations.  (R. 88-89, 92-94, 101-02, 105-07).  Like Dr. Bauer, Dr. Deboskey concluded that Plaintiff had a mild restriction in activities of daily living; moderate difficulties in maintaining social functioning; moderate difficulties in maintaining concentration persistence, or pace; and no repeated episodes of decompensation of extended duration.  (R. 89, 102).

On March 3, 2014, Dr. Krishnamurthy evaluated the medical evidence regarding Plaintiff's physical impairments at the reconsideration level for both her SSI and DIB claims. (R. 90-92, 94-96, 103-05, 107-09).  Dr. Krishnamurthy found that Plaintiff had some exertional and postural limitations and could perform light work.  *Id.*

### a. Drs. Bauer and Deboskey

The ALJ accorded "great weight" to the opinions of Drs. Bauer and Deboskey because they were "well supported by medically acceptable clinical findings and . . . consistent with other substantial medical evidence of record."  (R. 31).

Here, the undersigned finds that substantial evidence supports the ALJ's decision to afford "great weight" to the opinions of Drs. Bauer and Deboskey.  For example, the opinions of Drs. Bauer and Deboskey that Plaintiff had moderate difficulties in maintaining social functioning are consistent with Plaintiff's testimony at the hearing and information in her function report.  *See supra* Section V.B.1.; *see also* (R. 45, 51, 55, 218, 221).  As well, the opinions of Drs. Bauer and Deboskey that Plaintiff had moderate difficulties in concentration,

persistence, or pace are consistent with treatment notes from Plaintiff's providers. *See supra* Section V.B.1.; *see also* (R. 313, 668-71, 638-43, 653-67) (notes from ARNPs Foster, Bos, and Willis reflecting Plaintiff's concentration was "fair" and "good"). Lastly, the opinions of Drs. Bauer and Deboskey that Plaintiff had no repeated episodes of decompensation are supported by evidence of Plaintiff's single, brief hospitalization in May 2014. *See* (R. 446-85).

Moreover, although the opinion of a non-examining physician "taken alone" does not constitute substantial evidence to support an administrative law judge's decision, an administrative law judge can rely on a non-examining physician's report in denying benefits where, as here, "it does not contradict information in the examining physicians' reports." *Huntley v. Soc. Sec. Admin.,* 683 F. App'x 830, 832 (11th Cir. 2017) (citations omitted). Thus, "[a]lthough the opinion of an examining physician is ordinarily entitled to greater weight than that of a non-examining physician, the [ALJ] is free to reject the opinion of any physician when the evidence supports a contrary conclusion." *Id.* (citing *Sryock v. Heckler*, 764 F.2d 834, 835 (11th Cir. 1985)).

Accordingly, the undersigned finds no error in the ALJ's assignment of "great weight" to the opinions of Drs. Bauer and Deboskey. *See, e.g. Huntley*, 683 F. App'x at 833; *see also Ogranaja v. Comm'r of Soc. Sec.*, 186 F. App'x 848, 851 (11th Cir. 2006) (holding that substantial evidence supported the ALJ's decision to assign great weight to non-examining physicians' opinions that "were supported by and consistent with the record as a whole"); *Forsyth v. Comm'r of Soc. Sec.,* 503 F. App'x 892, 893 (11th Cir. 2013) (citing *Sryock,* 764 F.2d at 835) ("[a]lthough the opinion of an examining physician is ordinarily entitled to greater weight than that of a non-examining physician, the [ALJ] is free to reject the opinion of any physician when the evidence supports a contrary conclusion.").

### b. Dr. Krishnamurthy

On March 3, 2014, Dr. Krishnamurthy evaluated Plaintiff's physical impairments at the reconsideration level and opined on Plaintiff's exertional and postural limitations for Plaintiff's DIB (Exh. 5A) and SSI (Exh. 6A) claims. More specifically, Dr. Krishnamurthy opined that Plaintiff could lift and carry up to 10 pounds frequently and 20 pounds occasionally; stand, walk or sit for six hours in an 8-hour day; and could do unlimited pushing, pulling, and use hand or foot controls. (R. 90, 103). Plaintiff could never climb ladders, ropes or scaffolds, but could climb ramps/stairs, balance, stoop, kneel, crouch, and crawl. (R. 91, 104). Plaintiff was to avoid concentrated exposure to fumes, odors, dusts and hazards. (R. 92); *but see* (R. 105). Plaintiff could perform light work. (R. 95, 108).

In assigning "little weight" to Dr. Krishnamurthy's opinion, the ALJ referred to Exhibit 5A (DIB), and stated:

> [T]he undersigned is according little weight to [this] opinion because it is not supported by medically acceptable clinical findings and laboratory diagnostic techniques prior to the expiration of the date last insured.

(R. 31).

Plaintiff argues that the ALJ erred in finding that Dr. Krishnamurthy's opinion was "not supported by medically acceptable clinical findings and laboratory and diagnostic techniques prior to the date last insured." (ECF No. 16 at 18). Plaintiff points out that Dr. Krishnamurthy reviewed diagnostic evidence (a February 2012 MRI of Plaintiff's left knee).[14] *Id.*; *see also* (R. 90-91, 103-04).

---

[14] Dr. Krishnamurthy also reviewed records of a June 2013 hospital admission for chest pains, and a September 2013 record indicating Plaintiff's valproic acid level was 63 (relevant to seizures). (R. 90-91, 103-04). But the June 2013 records did not reveal any cardiac conditions that could support a reduced physical RFC finding, and Dr. Krishnamurthy concluded that

While Plaintiff's statement is correct, it does not translate to error in the ALJ's Decision. The 2012 MRI of Plaintiff's left knee indicates that Plaintiff's knee ligaments, lateral support structures, and fibula are intact. (R. 336-37). There was "no evidence of a ligamentous or meniscal tear" and Plaintiff's prior X-ray showed "no abnormality of the lateral femoral condyle." (R. 337). There was some mild swelling overlaying the medial collateral ligament, which "could be consistent with a low grade sprain." *Id.* Plaintiff was diagnosed with an "osteochondral injury of the weightbearing surface of the medical femoral condyle." *Id.* Notably, however, at the administrative hearing almost four years after this MRI, Plaintiff testified that her impediments to work were dyslexia, bipolar disorder, anxiety, and brain fog. (R. 46). Neither Plaintiff nor her attorney alluded to any physical limitation due to her knee, hip, or any other physical impairment. *See generally* (R. 41-63); *see also* (R. 229) (Plaintiff's disability report listing depression, anxiety, and bipolar disorder as the only conditions that limit Plaintiff's ability to work). Although an ALJ can assign great weight to a non-examining physician's opinion where it is consistent with the record, *Ogranaja*, 186 F. App'x at 848, that is not the case here. Thus, substantial evidence supports the ALJ's Decision to accord "little weight" to Dr. Krishnamurthy's opinion.

Lastly, as discussed more fully below, any error in the ALJ's assignment of "little weight" to Dr. Krishnamurthy's opinion (limiting Plaintiff to light work) is, at worst, harmless because the ALJ ultimately found at Step 5 that Plaintiff could perform two medium jobs (hand packager and machine packager, both unskilled) *and* two light jobs (housekeeper and shellfish preparer, both unskilled). (R. 33); *see Sherman v. Colvin*, 582 F. App'x 745, 749–50 (9th Cir. 2014) ("To the extent that the ALJ might have erred by also including semi-skilled jobs, this

---

Plaintiff's medical records did not support her allegations of seizure. *See* (R. 366-70, 392, 395, 91, 105).

error was harmless because the ALJ found that [Plaintiff] is capable of performing unskilled jobs that exist in significant numbers in the national economy."); *see also Molina v. Astrue,* 674 F.3d 1104, 1115 (9th Cir. 2012) ("[A]n ALJ's error is harmless where it is inconsequential to the ultimate nondisability determination.") (citations omitted).

### C. The ALJ's RFC Assessment is Supported by Substantial Evidence

Relatedly, Plaintiff argues that the ALJ's errors in weighing the medical opinions resulted in an incorrect mental and physical RFC.[15] (ECF No. 16 at 17-18). But, having found that the ALJ's assignment of weight was supported by substantial evidence, the undersigned finds no merit to Plaintiff's challenge to the ALJ's RFC determination.

A claimant's RFC is the most a claimant can do despite the limitations caused by her impairments. 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1). Ultimately, the responsibility for determining a claimant's RFC rests with the ALJ, and she is not required to give any special significance to the opinion of medical sources on the issue. 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2). The ALJ determines the RFC by considering all relevant medical and other evidence. *Phillips*, 357 F.3d at 1238-39; *see also* 20 C.F.R. §§ 404.1520(e), 416.920(e). In making an RFC determination, the ALJ is not required to specifically refer to every piece of evidence in the record, so long as the ALJ's decision is not a broad rejection of the claimant's condition as a whole. *Packer v. Soc. Sec. Admin.,* 542. F. App'x 890, 891-92 (11th Cir. 2013) (citing *Dyer v. Barnhart,* 395 F.3d 1206, 1211 (11th Cir. 2005)). Rather, the ALJ must provide

---

[15] Plaintiff's also argues that the ALJ erred in not mentioning the 2015 X-ray of Plaintiff's hip that demonstrated osteonecrosis of the left femoral head. (ECF No. 16 at 18). However, the ALJ need not cite every piece of evidence when determining a claimant's RFC. *Packer*, 542. F. App'x at 891-92 (citing *Dyer*, 395 F.3d at 1211); *see also supra* note 5, at 13. Further, the mere existence of an impairment does not reveal the extent to which the impairment limits a claimant's ability to work. *Moore*, 405 F.3d at 1213, n.6.

enough reasoning for a reviewing court to conclude that the ALJ considered the claimant's medical condition. *Id.* at 891 (citation omitted).

Here, the ALJ found that Plaintiff "has the residual functional capacity to perform a full range of work at all exertional levels but with the following non-exertional limitations: the claimant is able to concentrate and persist for 2-hour segments and is limited to occasional interaction with others." (R. 27). As discussed above, the opinions of Drs. Bauer and Deboskey support this assessment. *See supra* Section V.B.2.a.; *see also* (R. 45, 50, 55, 218, 221, 313, 668-71, 638-43, 653-67).

Furthermore, at the administrative hearing, Plaintiff testified that her only impediments to working were mental impairments, and neither Plaintiff nor her attorney alleged any physical limitations. *See generally* (R. 41-63); *see also* (R. 229). Indeed, during the ALJ's questioning of the Vocational Expert, with Plaintiff and her counsel present, the Vocational Expert specifically sought clarification from the ALJ, asking, "And there are no physical limitations, right?" The ALJ responded, "Correct." (R. 61). The ALJ then posed two hypotheticals to the Vocational Expert, neither of which contained any physical limitations. After the Vocational Expert responded to these hypotheticals, the ALJ asked counsel whether he had any additional questions for the Vocational Expert. Counsel responded, "I have no questions." (R. 62). In any event, any error in the ALJ's physical RFC assessment would be, at worst, harmless because the ALJ ultimately found at Step 5 that Plaintiff could perform two light jobs (housekeeper and shellfish preparer, both unskilled) consistent with Dr. Krishnamurthy's opinion. (R. 33).

Accordingly, the undersigned finds that the ALJ's RFC assessment is supported by substantial evidence.

**D.      The ALJ Properly Assessed Plaintiff's Credibility**

Finally, Plaintiff argues that the ALJ erred in evaluating Plaintiff's credibility.  (ECF No. 16 at 18).  Credibility determinations are the province of the ALJ.  *Moore*, 405 F.3d at 1212 (citing *Wilson v. Heckler*, 734 F.2d 513, 517 (11th Cir.1984)).  When considering a claimant's statement of symptoms, an ALJ must follow a two-step process.  "Step one is to determine whether the individual has a medically determinable impairment that could reasonably be expected to produce the alleged symptoms."  *Contreras-Zambrano v. Soc. Sec. Admin.,* No. 17-12447, 2018 WL 618420, at *3 (11th Cir. Jan. 30, 2018) (citing SSR 16-3p, 82 Fed. Reg. 49,463-64 (Oct. 25, 2017)).  "Step two is to evaluate the intensity and persistence of an individual's symptoms, such as pain, and determine the extent to which an individual's symptoms limit her ability to perform work-related activities."  *Id.* (citing SSR 16-3p, 82 Fed. Reg. at 49,464-66)).  An ALJ considers "whether there are any inconsistencies in the evidence and the extent to which there are any conflicts between [her] statements and the rest of the evidence, including [her] history, the signs and laboratory findings, and statements by [her] medical sources or other persons about how [her] symptoms affect [her]." 20 C.F.R. §§ 404.1529(c)(4), 416.929(c)(4).

Here, the ALJ found that Plaintiff's medically determinable impairment could reasonably be expected to produce the alleged symptoms, but found inconsistencies in the evidence as to the intensity, persistence, and limiting effects of Plaintiff's impairments.  *See* (R. 25, 28).  Specifically, the ALJ found Plaintiff's symptoms were controlled with medication and that her mental status examinations were consistently within normal range.  (R. 30-31).  The ALJ also weighed Plaintiff's testimony that she does not like to leave her house against Plaintiff's testimony that she lives with a roommate without issue, leaves the house to go grocery shopping, and worked after the alleged onset date.  (R. 30).  Plaintiff challenges the ALJ's evaluation of the

extent of her activities of daily living, failed work attempts, purported improvement with medications, and overall medical records. (ECF No. 16 at 18-20).

Having reviewed the record as a whole, the undersigned finds the ALJ applied the correct legal standard to evaluate Plaintiff's credibility and that the ALJ's findings are supported by substantial evidence. For example, Plaintiff testified that her medications helped her anxiety and bipolar disorder, which is corroborated by the record. (R. 47, 309-13, 315, 371-72, 523, 640-41, 654-57, 660-63). The ALJ also accurately cited Plaintiff's testimony regarding her grocery shopping, roommate, and post-DLI work attempts. (R. 43-45, 50-51). Lastly, the record supports the ALJ's conclusion that Plaintiff's mental status examinations were mostly within normal range. *See supra* Section V.B.1. Accordingly, the undersigned finds the ALJ properly evaluated Plaintiff's credibility. *Griffin v. Comm'r of Soc. Sec.*, 560 F. App'x 837, 842 (11th Cir. 2014) (citing *Foote v. Chater*, 67 F.3d 1553, 1562 (11th Cir. 1995) ("A clearly articulated credibility finding with substantial supporting evidence in the record will not be disturbed by a reviewing court.").

## VI.     CONCLUSION

For the reasons stated above, it is hereby **ORDERED AND ADJUDGED** that:

1.     Plaintiff's Motion for Summary Judgment (ECF No. 16) is **DENIED**, Defendant's Motion for Summary Judgment (ECF No. 21) is **GRANTED**, and the ALJ's Decision is **AFFIRMED**.

2.      The Clerk is directed to enter judgment in favor of Defendant, to terminate all pending motions, and to **CLOSE** the case.

**DONE AND ORDERED** at Chambers, in Fort Lauderdale, Florida, on September 13th, 2018.

_____
ALICIA O. VALLE
UNITED STATES MAGISTRATE JUDGE

cc:     All Counsel of Record